STATE of Iowa, Appellee,

v.

Clarence WILLIAMS, Appellant.

No. 96–1977.

Supreme Court of Iowa.

Jan. 21, 1998.

Amy L. Evenson of Larson, Mowry & Evenson, Iowa City, for appellant.

Thomas J. Miller, Attorney General, Julie H. Brown, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and D. Raymond Walton, Assistant County Attorney, for appellee.

Considered by McGIVERIN, C.J., and CARTER, LAVORATO, ANDREASEN, and TERNUS, JJ.

ANDREASEN, Justice.

This case involves the sexual abuse of a minor by four individuals. The defendant, Clarence Evon Williams, Jr., appeals from a conviction and sentence on a charge of sexual abuse in the second degree in violation of Iowa Code sections 709.1, .3(3) (1995). Williams claims: (1) there was insufficient evidence in the record for a rational jury to find he committed the charged offense; (2) it was error to admit evidence of a DNA match without also requiring evidence of the statistical significance of the match and to admit blood serology evidence; (3) it was error to exclude evidence that the victim had consensual sexual intercourse the evening prior to the offense; (4) the twenty-five month delay between the incident and the filing of charges against him was a denial of his due process rights; (5) he was provided ineffective assistance of counsel; and (6) the trials of the co-defendants should have been severed. We affirm.

## I. *Background Facts and Proceedings.*

Early in the afternoon on November 23, 1993, L.H., a minor, her twin sister Lindie, and her friend Jamie Weise rendezvoused with George Epps, Byron Griffin, Matt Washburn, and Eric Wehr. They all went to Griffin's home in Epps' car where they stayed for approximately one hour. The four men then brought the three girls back to East High School where the girls took a bus home.

Later that afternoon the girls walked to a bowling alley. Weise telephoned Griffin and shortly thereafter Griffin, Washburn, and Wehr picked up the girls at the bowling alley and they all went back to Griffin's house. Sometime during the evening Washburn, Weise, and L.H. drove Lindie back to the bowling alley, left her there and returned to Griffin's home. At this point Epps, Griffin, L.H., Washburn, Wehr, and Weise were present at Griffin's home.

While testimony differs as to the exact time, sometime between 10:00 p.m. and 11:00 p.m., Lincoln Dixon, Dante Hunter, and Williams arrived at Griffin's house. Because it is relevant to the testimony, we mention that Dixon, Epps, Griffin, Hunter, and Williams are African–American. There is conflicting testimony as to whether Williams remained at Griffin's house. L.H. and Weise decided to leave Griffin's house and go to a roller-skating rink. Epps initially agreed to give the girls a ride to the skating rink. The other men present convinced Epps not to give them a ride. L.H. and Weise began walking to the skating rink. Griffin and Washburn went after the girls. When they caught up to them, the men each picked up one girl and began to carry them back to the house. The evidence suggests this was done in good nature. The men put the girls down before reaching the house and the girls walked the rest of the way back to the house. About the time the girls returned to the house Epps and Wehr left.

Upon returning to the house, Weise tried to telephone a friend to give her and L.H. a ride to the skating rink. After talking briefly with her friend the telephone went dead. L.H. went into the bedroom where the telephone jack was located to see if the cord was disconnected. Weise testified that Hunter followed L.H. into the bedroom and shut the door. She testified that she heard L.H. saying "no" and went to the bedroom to see what was happening. Upon opening the door Weise saw Hunter on top of L.H. on the bed. Weise stated L.H. was fighting Hunter. She testified Hunter slammed the door in her face. Weise then went to the living room to talk to Washburn. Weise and Washburn went into the kitchen and saw Williams enter the house through the kitchen door. Weise and Washburn left the house through the kitchen door and ran to Wehr's house.

Wehr testified that when Weise and Washburn arrived at his home Weise was crying and Washburn looked scared. Wehr further testified that Washburn said "they" were raping L.H. and that he feared they would come looking for him since he had left. Weise and Washburn hid in the basement of Wehr's house. Wehr testified that later Dixon, Griffin, Hunter, and Williams came to his house looking for Washburn.

Dixon, who pled guilty to a lesser offense in exchange for testifying against the other individuals alleged to have participated in the

sexual abuse of L.H., testified that after Weise and the "white dude" left the house he, Griffin, and Williams went to the bedroom. He testified that he saw Hunter on top of L.H. having sexual intercourse with her and she was saying "stop." He also testified Williams was the second person to have sexual intercourse with L.H. While Williams had sexual intercourse with L.H., Hunter held her down. Then Williams held L.H. down while Griffin had sexual intercourse with her. Finally, somebody held L.H. down while Dixon had sexual intercourse with her.

L.H. testified four men in succession had sexual intercourse with her against her will. She testified that one person held her down while another was on top of her. She stated that the first two men in the room were Hunter and Williams. L.H. said she was not sure as to the order of the men having sexual intercourse with her. After the men left, L.H. put her clothes on and left the house.

After leaving the house L.H. walked to a pay phone and called a friend to come and get her. L.H. was taken to the hospital where she was examined by a doctor and evidence was collected. While she was at the hospital L.H. told a nurse she was sexually abused by "three or four black dudes." After she was examined at the hospital, L.H. went to the police station where she reported what had transpired that evening.

At the hospital blood and semen evidence was collected. A vaginal swab was done and L.H.'s clothes were preserved. On L.H.'s underpants dried semen was found in three locations: the crotch, the lower back portion, and the center back portion. During the investigation of the assault, blood serology tests were conducted on the evidence by Marie Sides, a criminalist with the Iowa Division of Criminal Investigation. The tests indicated Williams was a possible source of the semen stains on the victim's underpants.

A DNA analysis of the evidence gathered from the victim and blood samples taken from the alleged participants in the sexual abuse was conducted by Supervisory Special Agent of the Federal Bureau of Investigation John Quill. The evidence samples arrived at the FBI laboratory on January 31, 1994.

Due to an error in the process, the results of the first DNA analysis were not clear enough to be reliably interpreted. Quill requested additional blood samples for a new DNA analysis. On October 3, the second set of blood samples arrived at the FBI lab. A report detailing the results of the DNA testing was sent to Sides on June 27, 1995. On December 18 a complaint was filed and the next day an arrest warrant was issued against Williams.

## II. *Sufficiency of the Evidence.*

 Williams' first assignment of error is a challenge to the sufficiency of the evidence.

> In a sufficiency-of-the-evidence challenge we review all the evidence to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We view the evidence in the light most favorable to the State and draw all fair and reasonable inferences from all the evidence. We do not uphold a verdict on evidence that merely raises suspicion, speculation, or conjecture regarding guilt.

*State v. Brown,* 569 N.W.2d 113, 115 (Iowa 1997) (citations omitted). To convict Williams of sexual abuse in the second degree the State was required to prove: (1) that Williams performed a sex act with L.H.; (2) the act was done by force or against the will of L.H.; and (3) Williams was aided or abetted by one or more persons. Iowa Code §§ 709.1, .3(3). Williams contends the State failed to produce sufficient evidence that he participated in the sexual abuse of L.H. We find the State met its burden.

The testimony of Weise, Wehr, Dixon, and L.H. supports the conclusion that Williams performed a sex act with L.H., that the act was done against L.H.'s will and that Williams was aided or abetted by another. In addition to the testimony by witnesses to the event, testimony from Quill and Sides links Williams via physical evidence to the sexual abuse. We find a reasonable jury could conclude the State proved each element of the charged offense beyond a reasonable doubt.

III. *Admission of DNA and Blood Serology Evidence.*

■ Williams' second assignment of error regards the admission of evidence of a DNA match without requiring statistical probability evidence to interpret the meaning of the DNA match. He also alleges it was error for the court to allow blood serology evidence at trial.

A. Background on DNA Testing.

DNA is an abbreviation for deoxyribonucleic acid, the active substance of genes. DNA is a long double-helix shaped molecule found in every cell that has a nucleus. Cells having a nucleus include: white blood cells, sperm, cells surrounding hair roots, and cells in saliva. Committee on DNA Tech. in Forensic Science, Nat'l Research Council, *DNA Technology in Forensic Science,* S–1 (Prepublication Copy 1992) [hereinafter NRC Report]. Every person, with the exception of identical twins, has a unique configuration of DNA. *Id.* at S–2. Each component strand of the double helix is a chain of nucleotides composed of four chemicals arranged in "base pairs." Of the three billion "base pairs" which constitute the DNA molecule, ninety-nine percent do not vary between individuals of the same species. Any two human genomes differ at about three million sites. *Id.* at 3–1.

DNA profiling focuses on the differences, known as polymorphisms, where variation occurs. The purpose of DNA testing is to detect differences among samples taken from different individuals or sources. *Nelson v. State,* 628 A.2d 69, 75 (Del.1993). Specific sites are examined on each sample of DNA. When two samples from different sources are compared, if a site on one sample does not match the same site on the other sample the two samples cannot have a common source. However, if two sites do match they *may but do not necessarily* have a common source. There is a chance that two different individuals may have the same DNA pattern at any given site. NRC Report at 3–1. Scientists have not developed DNA profiles that cannot be shared by two or more people. *State v. Bloom,* 516 N.W.2d 159, 161 (Minn.1994). Because only a small number of the total differences are examined, it is possible that two people may have the same DNA at a specific site but that the match does not confirm the samples being identical.

DNA testing cannot conclusively identify the perpetrator of a crime for the simple reason that the entire DNA strand is not examined. The underlying theory of the forensic use of DNA is that "as the number and variability of the polymorphisms utilized in the typing procedure increases, the odds of two people having the same profile become vanishingly small." *Id.* Statistics are used to indicate probability of a random match between samples. The statistics indicate the probability that a randomly selected person, if tested, would have the same DNA profile as that of the sample left at the crime scene. *Id.*

B. Calculation of Statistics.

The probability that a randomly selected person has the same DNA profile as that of the sample from the crime scene is calculated using the product or multiplication rule. Each site examined by the DNA test is compared against a database to determine frequency that the particular DNA pattern appears in the general population. The probability for each site is determined. The overall probability of a random match is then calculated by multiplying the individual probabilities for each site. *State v. Streich,* 163 Vt. 331, 658 A.2d 38, 45 (1995). For example assume three sites have been examined in the DNA test. The first site appears in ten percent of the database samples, the second site appears in twenty percent of the samples and the third in five percent of the samples. The odds that another person randomly selected from the population has all three same patterns is 1 in 1000 (1/10 × 1/5 × 1/20).

C. Admissibility of Statistics.

Whether statistics can, should, or must be admitted when evidence of a DNA match is admitted was an issue of significant controversy. Numerous lengthy, highly technical, and scholarly opinions were written on the validity of the probability statistics and whether or under what circumstances they could be admitted. *See State v. Sivri,* 231

Conn. 115, 646 A.2d 169 (1994); *United States v. Porter*, 618 A.2d 629 (D.C.1992); *State v. Cauthron*, 120 Wash.2d 879, 846 P.2d 502 (1993), *abrogated by State v. Copeland*, 130 Wash.2d 244, 922 P.2d 1304 (1996).

Early in the controversy some courts refused to allow statistical probability of a random match into evidence. *See State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483, 494 (1992). Recently, the debate, or as it has been called, the "DNA fingerprinting wars" has subsided. *Armstead v. State*, 342 Md. 38, 673 A.2d 221, 238 (1996). Today "[c]ourts considering the admissibility of statistical probability evidence ... overwhelmingly confirm the trial court's decision to admit them." *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276, 292 (1997) (citations omitted).

We have held DNA testing is sufficiently reliable to be admitted into evidence. *State v. Brown*, 470 N.W.2d 30, 32 (Iowa 1991). In *Brown*, we upheld the trial court's admission of DNA testing and the admission of the accompanying statistics. *Id.* at 33. The defendant in *Brown* had objected to the admission of the statistical probability on the basis that expert testimony was not needed on the issue because the jury could make the calculations on its own. *Id.* We expressed our doubt that the jury could correctly calculate the probability and found furnishing the statistics would be helpful to the trier of fact in accordance with the criteria for admissibility under Iowa Rule of Evidence 702. In considering the admission of the statistics we stated "[w]ithout statistical evidence, the ultimate results of DNA testing would become a matter of speculation." *Id.*

■ This court in *Brown* found it was not an abuse of discretion to admit the statistical probability of a random match. *Id.; see also State v. Ripperger,* 514 N.W.2d 740, 751 (Iowa App.1994). Today we go one step further and hold that the admission of evidence of a DNA match without accompanying statistical probability of a random match is error. We agree with the NRC Report which stated "[t]o say that two [DNA] patterns match, without providing any scientific valid estimate ... of the frequency with which such matches might occur by chance, is meaningless." NRC Report at 3–1. As

one court phrased it "[w]ithout the probability assessment, the jury does not know what to make of the fact that the patterns match: the jury does not know whether the patterns are as common as pictures with two eyes, or as unique as the Mona Lisa." *United States v. Yee*, 134 F.R.D. 161, 181 (N.D.Ohio 1991). Although the trial court could not have anticipated our decision we find it was error to admit evidence of the DNA match without the accompanying statistical probability of a random match.

■ Not all errors require reversal. To warrant reversal the error must have prejudiced the defendant. *State v. Boley,* 456 N.W.2d 674, 678 (Iowa 1990).

When an error is not of constitutional magnitude, the test of prejudice [for harmless error] is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.

*State v. Traywick,* 468 N.W.2d 452, 454 (Iowa 1991).

The court's admission of DNA evidence without the accompanying probability statistics was not an error of constitutional magnitude. The DNA test results, like the blood serology test results, merely established Williams could have been a contributor to two of the semen stains found on L.H.'s underpants. It was cumulative evidence that did not injuriously affect Williams' rights. In his testimony, Quill stated that based on the DNA evidence he could not exclude Williams as a possible donor. He did not say Williams was the donor. Based on the testimony of the witnesses present at Griffin's house the night of the assault and the cumulative nature of the evidence, we find Williams has not suffered any miscarriage of justice by the admission of the DNA evidence without the accompanying probability statistics. We find the error to be harmless.

### D. Blood Serology Evidence.

■ Williams argues the court erred when it admitted blood serology evidence. Blood serology tests were performed on the semen stains recovered from L.H.'s underpants. Williams contends that because there were

multiple donors of fluids in the tested samples, the blood serology test could not conclusively link any particular defendant to the semen stains and therefore the evidence was not relevant and should have been excluded. We disagree.

Evidence having any tendency to make a consequential fact more or less probative is relevant. Iowa R. Evid. 401. Although the blood test could not conclusively link Williams to the sexual abuse of L.H., the evidence and testimony regarding it had probative value. Sides testified that the serology tests indicated Williams could have been a contributor to the semen stains in L.H.'s underpants. Evidence that Williams could have contributed the semen found in L.H.'s underpants makes the fact that he actually participated more likely. Thus, the evidence is relevant to his participating in the sexual abuse of L.H. We find the evidence was properly admitted.

IV. *Refusal to Allow Evidence of Prior Sexual Activity.*

█ A. Williams, in a motion that complied with Iowa Rule of Evidence 412(b), requested he be allowed to present evidence that L.H. purportedly had sexual intercourse with Curtis Branch the night prior to the attack. Williams wanted to introduce the evidence to show that there was another possible source for the DNA and blood serology evidence and thus make it less likely that he participated in the forced sexual assault of L.H. We find this complaint to be without merit.

A hearing was held on Williams' motion. The court in its order regarding Williams' motion held:

If serologic and DNA analysis of Curtis Branch excludes him as a donor of the materials tested, then his sexual contact with the alleged victim is clearly irrelevant and inadmissible. However, if the analysis fails to exclude Branch and includes him as a possible donor, just as it has included the four defendants as possible donors, then by the same rationale this evidence is likewise admissible as tending to make the defendants more or less likely to be the sources of the seminal fluid recovered.

The record indicates a DNA analysis was performed on specimens provided by Curtis Branch. There is no indication as to the results of the DNA test. No evidence of the results was presented at trial. If the test could not exclude Branch and was therefore admissible under the trial court's ruling, Williams waived his objection by not admitting the results at trial. If the test excluded Branch as a possible donor then the evidence was not relevant and it was properly excluded.

█ B. In his motion, Williams also requested he be allowed to introduce evidence L.H. had a sexually transmitted disease. Tests done on L.H. within hours after the sexual assault indicated she had gonorrhea. Testimony by a medical doctor at the evidentiary hearing revealed gonorrhea has an incubation period of two to twenty-one days. The disease could not have been contracted during the attack because, if it had been, it would not have had time to become active prior to the tests. Williams argues this is evidence of prior sexual contact and could provide another explanation of the source of the semen stains. He also argues that since he did not have gonorrhea this is evidence he did not participate in the attack on L.H. The trial court excluded evidence of the venereal disease finding it irrelevant and highly inflammatory. We agree and find no abuse of discretion.

V. *Twenty–Five Month Delay.*

█ Williams' next assignment of error is that his due process rights were violated by the twenty-five month delay between the attack on L.H. and the time he was arrested for his involvement in the attack. Because this claim involves an alleged violation of Williams' constitutional rights, our review is de novo. *State v. Trompeter,* 555 N.W.2d 468, 470 (Iowa 1996). Williams alleges the reason for the delay was so the State could try the four defendants together as adults. At the time of the attack Williams was twenty years old. His three co-defendants were minors.

█ To prove a pre-accusatorial delay violated his due process rights Williams must

show: (1) that the delay was unreasonable; and (2) that his defense was thereby prejudiced. *Id.* Unreasonable delay "involves a consideration of both the length of the delay and the State's reason for it." *Id.* The prejudice must be actual. *State v. Lange,* 531 N.W.2d 108, 111 (Iowa 1995). Mere general assertions of prejudice are not sufficient. *Id.*

We have said a legitimate reason for delay is time required for further investigation into the crime. *Id.* One reason the State cites for the delay was the wait to get DNA test results back from the FBI laboratory. The State had no control over the length of time it took to get the results. Once the results were obtained the State went forward with the case within six months. Although the delay is not explained, we do not find it to be unreasonable.

Williams has failed to show actual prejudice to his rights. He alleges that the memories of the witnesses to the events the night of the attack faded with the passage of time. The witnesses to the attack gave statements to the police shortly thereafter. Any difficulties they may have had with recalling details were obviated by their refreshing their recollection by reviewing their statements. Williams was told he was a suspect within a few days after L.H. reported the attack. We find no violation of Williams' constitutional rights.

### VI. *Ineffective Assistance of Counsel.*

 Williams claims his counsel was ineffective in failing to move to have the charges against him dismissed on the basis of pre-accusatorial delay. While we do not usually resolve ineffective assistance of counsel claims on direct appeal we will address the issue here. *State v. Atley,* 564 N.W.2d 817, 833 (Iowa 1997). We review ineffective assistance of counsel claims de novo. *State v. Cook,* 565 N.W.2d 611, 613 (Iowa 1997). To establish a claim for ineffective assistance of counsel Williams must prove by a preponderance of evidence that: (1) his counsel failed to perform an essential duty; and (2) prejudice resulted. *Id.* at 613–14. Because we found that the delay did not violate Williams' constitutional rights he cannot show preju-

dice from the failure to move for dismissal. We find his claim to be without merit.

### VII. *Severing the Trials.*

 Williams' final assignment of error is that the trial court erred when it refused to sever the trials of the three defendants in the attack on L.H. Our review is for an abuse of discretion. *State v. McFadden,* 443 N.W.2d 70 (Iowa App.1989). Severing the trials of co-defendants is required in two instances: (1) where the trial is so complex and the evidence so voluminous that the jury will be confused and cannot compartmentalize the evidence; or (2) where the evidence admitted by or against one defendant is so prejudicial to a co-defendant, the jury is likely to wrongly use it against the co-defendant. *Id.* at 71.

We find the court did not abuse its discretion in denying the request to sever the trials of the co-defendants. The trial of the three defendants was not especially complex nor was more than a normal amount of evidence presented. The evidence presented by the State was, for the most part, not specifically addressed to any one defendant. Both the DNA and blood serology test results implicated all the defendants equally in that none of them could be excluded by the results. The testimony of the witnesses also implicated all three defendants. We are confident the jury was able to compartmentalize the evidence where necessary and that no prejudice resulted to Williams as a result of the joint trial.

**AFFIRMED.**