# IN THE COURT OF APPEALS OF IOWA

No. 19-1203
Filed January 27, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**KOURTNEY SHONTEZ HALL,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Polk County Robert B. Hanson, Judge.


Kourtney Shontez Hall appeals his conviction of second-degree burglary.
**AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.


Considered by May, P.J., Ahlers, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**POTTERFIELD, Senior Judge.**

Kourtney Shontez Hall appeals his conviction of second-degree burglary, contending the district court abused its discretion in allowing prior-bad-acts evidence.

**I. Background Facts and Proceedings.**

Jonathan Metz and Lisa Takes were at home with their teenage son in West Des Moines on the evening of February 3, 2019. Metz was in the basement and fell asleep about 9:30 p.m. while watching the Super Bowl. Takes and their son were asleep in their bedrooms on the second floor by 10:00 p.m.

Metz woke up around 4:45 the next morning and could not find the coat his employer had given him—a neon yellow work coat with "El Conquistador" on the back. Metz noticed the forty-two-inch television was missing from the entertainment cabinet. Metz went upstairs and told his wife they had been robbed. Takes went to her car in the garage and found her purse had been taken and a cheetah-print wallet with credit and gift cards had been taken from her glove box. Also missing were Takes's winter coat, a bottle of perfume, a Wii system, and their son's backpack with his school laptop inside. Metz called the police to report the intrusion.

West Des Moines police officer Zachary Fries responded to the scene and found distinctive footprints in the mud at the back of the house leading to a three-season porch. Inside the porch was an unlocked sliding glass door.

Detective Christopher Vesey overheard other officers talking about the case at the station and the theory that someone would have needed to know the layout of the house. He suggested Hall as a possible suspect.

Detective Vesey was assigned to investigate the case and was aware that a white Chevy Malibu was observed at the scene. He learned Hall drove his girlfriend's white Chevy Malibu and that Hall had an upcoming appointment on the morning of February 5. Detective Vesey went to the location of the appointment and found a white Chevy Malibu parked in the lot.[1] The vehicle was registered to Emily Bowers—Hall's girlfriend. Through a window, Detective Vesey saw a black backpack with fluorescent green stripes in the passenger seat. He took a photo of the backpack and shared it with Takes via cell phone, who identified it as her son's.

The vehicle was impounded, and Detective Vesey obtained a search warrant. Inside the Malibu, Detective Vesey found Metz's work jacket, a lock with Metz's name on it, the teen's backpack, the Wii system, and various bank cards with Takes's name on them. Hall's driver's license was among the cards. On the passenger seat, Detective Vesey located a black leather jacket with a loaded Glock nine millimeter handgun in the pocket. The gun was registered to Jeanette Jones, who had reported it stolen about two weeks earlier. Jones and Bowers were housemates.

After Detective Vesey impounded the vehicle, he spoke with Bowers. Bowers told Detective Vesey that Hall had been driving her car. She was upset when she learned stolen items had been found in her vehicle. Bowers provided Detective Vesey with black pants and a pair of muddy orange Nike Air Force shoes she said Hall was wearing on February 3. In picking up the black pants, they felt heavy. Bowers reached into the pocket of the pants and pulled out credit and

---

[1] A video was submitted of Hall exiting the Malibu in the parking lot.

membership cards and documents bearing Takes's and Metz's names. The tread on the shoes had the same distinctive pattern as the shoe prints at the scene. She also gave him a cheetah-print wallet Hall had given her the day before.

Hall was arrested and charged with burglary in the second degree, trafficking in stolen weapons, and carrying weapons.

The defense filed a motion in limine requesting the court not allow the jury to hear Hall "previously committed a crime of theft against the accusers in this present matter unless that matter is placed at issue by the defendant."

The State resisted, suggesting several non-propensity purposes for admitting the prior-bad-acts evidence—identity, knowledge, motive, and intent.

At trial, Bowers testified she spent February 3 with Hall and that they went to bed around 10:00 p.m. However, Hall said he could not sleep and was going to the gym to work out. He grabbed the keys to her Malibu and left. Bowers tried to call and text him when he failed to come home by 11:30 p.m., but he did not respond so she went back to sleep. Bowers stated Hall returned about 4:30 a.m. and explained that he had been out with a friend. He left again to go work out and go to work. When he came back that afternoon, he told her he got a good deal on a forty-two-inch television and a Wii system. And as a gift for being out all night, he presented her with a cheetah-print wallet.

Bowers testified that on February 5, Detective Vesey showed up at her house and informed her the Malibu had been impounded. She stated Hall was driving the car that day and the jacket found in the car was Hall's—they had an argument after he purchased it the prior weekend because it was expensive. She denied ever wearing the coat and that she owned a gun, though her roommate

had one at one time. She testified she gave Detective Vesey shoes and pants she believed Hall was wearing on February 3. Bowers agreed Hall did not live at her house full time but stayed there often and left clothes and personal items there. She was not certain what Hall wore when he left the house the night of February 3, explaining on re-direct that she was in bed and it was dark. She testified he changed clothes when he returned at 4:30 a.m.

Martin Frederickson, Metz and Takes's neighbor, testified he saw a white Malibu parked across the street from his and the Metz-Takes residences around midnight on the night of the burglary. The car had not been there when he left to drive to a nearby convenience store at about 11:30 p.m.

Metz testified about the intrusion and theft. Metz stated he knew Hall from when Hall dated Takes's sister six or seven years before and that Hall had stayed over at their house during that time. Metz said Hall would have known he kept firearms in his house and that he arms himself. Metz then testified in response to the question:

> Q. And just to be very clear about this, without going into the details, is it true that prior to this occasion on February 3 you have been previously a victim of the defendant's crime that he has been convicted of? A. That's correct, yeah.
> Q. So this would be, then, the second time the defendant has victimized you? A. Yes.

On cross-examination, Metz admitted he did not see the intruder and did not have surveillance in his house. He acknowledged all the items taken were on the main floor of the house. He said he had not seen Hall in the last six years.

Takes testified Metz woke her up on February 4 and told her they had been robbed. She remembered thinking, "It had to be someone that knew our house to

come in through the back off the three-seasons porch and knew where things were at and then to get in and out quickly without being heard." She testified that, prior to the intrusion, she routinely left her purse in her car. She identified her purse, wallet, and the items that had been in her wallet and purse. Takes stated she knew Hall because he dated her sister six years earlier, had been in their home, and lived with them for a short time. She testified she locked her car in the garage and left her keys on the kitchen counter. So, the intruder would have had to take her key, go to the garage, unlock her car door, and get into the glove box. She testified her car key was stolen as well.

Jones testified she had been Bowers's roommate. She knew Hall and stated he had "basically lived [with them] for about ten months." Jones stated she had once owned a "nine mil- Glock" that had been stolen. She provided the serial number. Jones stated she had kept it between her mattresses. Jones testified Bowers knew she had a gun and that she and Hall had talked about her gun but she never showed it to him. She reported the gun missing to police about two weeks before Hall was arrested. Jones testified she learned her gun was found in the pocket of a jacket lying in Bowers's car. She did not know to whom the jacket belonged.

Detective Vesey testified about his investigation and acknowledged he had not considered Bowers a suspect. There were no latent fingerprints found on the Glock. Detective Vesey acknowledged no one told him they had seen Hall with the gun. He stated he relied on Bowers's statements to him, her emotional response to his inquiries, and finding the items in Hall's pants pocket. He stated, "She became very visibly upset. She was kind of taken back by everything

involved. I think it was kind of dawning on her what was really happening, the big picture."

The jury found Hall guilty of second-degree burglary, but it acquitted him of the two weapons charges. The court denied Hall's motion for new trial, finding "the greater amount of the credible evidence supports the verdict that was rendered."

**II. Discussion.**

On appeal, Hall asserts the court abused its discretion in allowing Metz's testimony about the prior "victimization."[2] "We review rulings on the admission of evidence of prior bad acts for an abuse of discretion." *State v. Goodson*, 958 N.W.2d 791, 798 (Iowa 2021) (citation omitted). "We reverse a district court's admission as an abuse of discretion if the grounds or reasoning for admission were 'clearly untenable or clearly unreasonable.'" *Id.* (citation omitted).

"Evidence of a crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). It may, however, be admissible for other purposes, such as proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2). We follow a three-step approach:

> (1) "the evidence must be relevant and material to a legitimate issue in the case other than a general propensity to commit wrongful acts";
> (2) "there must be clear proof the individual against whom the

---

[2] Hall argues in the alternative that if error was not properly preserved, defense counsel was ineffective. Because judgment was entered after the effective date of legislation prohibiting us from reviewing ineffective-assistance-of-counsel claims on direct appeal, we do not have the authority to address a claim of ineffective assistance of counsel. *See* Iowa Code § 814.7 (Supp. 2019); *State v. Treptow*, 960 N.W.2d 98, 107–08 (Iowa 2021) (rejecting constitutional challenges to statutory amendment).

evidence is offered committed the bad act or crime"; and (3) if the first two prongs are satisfied, "the court must then decide if [the evidence's] probative value is substantially outweighed by the danger of unfair prejudice to the defendant."

*Goodson*, 958 N.W.2d at 799–800 (alteration in original) (citations omitted).

As argued to the district court during the hearing on the motion in limine:

> PROSECUTOR: The testimony would be to the effect—and it will be through the witness Jon Metz—that basically the facts of the burglary as it occurred, it was at night and it was so quick and quiet it seemed to them the person knew the layout of their house. They had been previously victimized by the defendant.
>
> The defendant had been in their house six years prior, had basically lived with them at different moments or stayed the night. Right away they suspected him. He had stolen from them in the past. They couldn't think of anybody else that would have done this. The testimony would be limited to that. The reality is that five or six years ago the defendant stole a handgun from Jon Metz, and so I think us going into that would be crossing the line. But just to say that you were victimized previously by the defendant. How do you know the defendant? He lived with us, basically, for some period of time, and we were victimized by him then, so we suspected him right away.
>
> THE COURT: So was it a prior conviction, or was it a prior—
> PROSECUTOR: It was a prior conviction.
> THE COURT: And burglary or theft or what?
> PROSECUTOR: Theft of a firearm.
> . . . .
> PROSECUTOR: Theft third.
> DEFENSE COUNSEL: You know, but, Your Honor, burglaries happen every day. You don't need to know the layout of the house. You open the door and walk in quietly with a flashlight, and you find what you want to take. There's nothing in that that says somebody knew the layout of the house.
>
> And that's what they're trying to say. They're trying to make the jury infer that no matter what, it was Kourtney Hall because he lived there before. Anybody could have stolen anything from that house.
>
> THE COURT: Well, I'm going to deny the motion in limine. I'm going to allow you to introduce that testimony. And if you need to make some record, Ms. Turner, then you go ahead and do it with timely objections on the record.
> DEFENSE COUNSEL: Okay. So, Your Honor, just to be clear, so you're denying that portion of my motion in limine?
> THE COURT: Right.

DEFENSE COUNSEL: Are they allowed to bring up—I guess, your only intent is to bring up that he committed a theft upon Jonathan Metz at one point?

PROSECUTOR: That's correct. Yes.

DEFENSE COUNSEL: Okay. And so you're not going to go into the fact that there was a gun stolen?

PROSECUTOR: No.

PROSECUTOR: I would like to, but I can see where that's overstepping.

THE COURT: But you are going to address some of the other particulars: That he lived there at the house, the same house—

PROSECUTOR: Correct.

THE COURT: —he had knowledge of the house and its layout?

PROSECUTOR: And if I may touch on just something that Ms. Turner had said in her previous argument, Your Honor.

In the middle of the night to break into a home where everyone is sleeping, there are certain elements that come with that: Knowledge of this home, coming in, going to several different rooms to gather items. There is a level of knowledge to this home that that has.

And so, yes, we will be laying all of that foundation and that the relationship did not maybe end on good terms and that there was a theft, and that would be it. That is about as far as we want to go.

We find no abuse of discretion in the court's ruling that there were non-propensity purposes for allowing evidence that Hall previously stole something from Metz's home—that evidence was probative of knowledge of the house lay out and points of entry and suggested opportunity and intent. And there was clear proof of the prior theft—Hall was convicted.

And, Hall does not challenge the admissibility of testimony that Metz knew Hall, that Hall had dated Metz's sister-in-law, and that Hall had stayed at Metz's house.

However, Hall asserts the testimony by Metz—as it was elicited—should not have been allowed:

Q. And just to be very clear about this, without going into the details, is it true that prior to this occasion on February 3 you have

been previously a *victim* of the defendant's crime that he has been convicted of? A. That's correct, yeah.

Q. So this would be, then, the second time the defendant has *victimized* you? A. Yes.

The question asked by the prosecutor was not focused on theft. Being "a victim of the defendant's crime that he has been convicted of" is so ambiguous as to be irrelevant. What crime? As asked, the response appears relevant only to show propensity and was irrelevant to any permissible use. *See* Iowa R. Evid. 5.404(b).

"Nevertheless, '[w]e only find reversible error when the admission of improper evidence affects a party's substantial rights.'" *State v. Neiderbach*, 837 N.W.2d 180, 205 (Iowa 2013) (alteration in original) (citation omitted)); *accord State v. Williams*, 574 N.W.2d 293, 298 (Iowa 1998) ("Not all errors require reversal. To warrant reversal the error must have prejudiced the defendant."); *State v. Traywick*, 468 N.W.2d 452, 454–55 (Iowa 1991) ("When an alleged error is not of constitutional magnitude, 'the test of prejudice [for harmless error purposes] is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice.'" (alteration in original) (citation omitted)).

There was but a brief mention of a prior crime by Hall. The defense vigorously asserted it was Bowers, not Hall, who committed the burglary. The jury rejected that theory. The jury acquitted Hall of the two weapons charges, which supports a determination the prior-bad-act evidence did not sway the jury to decide the case on impermissible grounds. And, the State's case against Hall was strong. The timing of the burglary coincided with Hall's use of Bowers's car, which the

neighbor saw across the street from the Metz-Takes residence. Items stolen from the residence were found in the car when Hall was driving it, and other stolen items were found in Hall's pants pocket. Hall presented Bowers with the cheetah print wallet stolen from Takes's car. And he brought home a forty-two-inch television and Wii the day after the burglary—both missing from the Metz-Takes' residence. Hall had shoes that were consistent with shoe prints outside the Metz-Takes residence. Under these circumstances, we cannot say Hall has suffered a miscarriage of justice. Consequently, we affirm the conviction.

**AFFIRMED.**